IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>AARON CHRISTOPHER LINDSEY,<br><br>        Defendant. | No. 4:22-cr-138<br><br><br>DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS COUNT 3 OF INDICTMENT AND RELATED NOTICE OF FORFEITURE UNDER *BRUEN* |

**INTRODUCTION**

On June 23, 2022, the Supreme Court issued its opinion in *New York State Rifle & Pistol Association v. Bruen*, No. 20-843, ___ U.S. ___, 142 S. Ct. 2111, 2022 WL 2251305 (June 23, 2022). *Bruen* significantly limited the test for whether a prohibition against possessing firearms is consistent with the Second Amendment's dictate that the right to keep and bear arms "shall not be infringed." In *Bruen,* the majority opinion explained: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at *11. The *Bruen* Court also held that the Second Amendment protects an individual's right to keep and bear arms in public for self-defense. *Id.*

Here, Mr. Lindsey has been charged in Count 3 with illegally possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). It is the government's burden to show § 922(g)(1) is "consistent" with the "historical tradition of firearm regulation." As discussed herein, it is not. At the time of the founding, while certain groups—including those who were deemed not loyal to the colonies, Black people, and Native Americans—were barred from possessing firearms, there is no historical tradition of firearm regulation for felons or others based on criminal

convictions. Laws existed at the time of the country's founding barring criminals from participating in other civic aspects of life, but no laws (as shown by historical reviews) limited possession of firearms by "criminals" at the time of the country's founding. Because there is no "historical analogue" for § 922(g)(1) on its face, or as applied here, the prohibition against Mr. Lindsey possessing a firearm in § 922(g)(1) violates his Second Amendment right, and the Court should dismiss the indictment.

## ARGUMENT

**I. Consistent with the recent opinion in *Bruen*, the Court should dismiss Count 3 of the indictment because there is no "historical analogue" to 18 U.S.C. § 922(g)(1).**

In *Bruen*, the Supreme Court undoubtedly reaffirmed its holding that the Second Amendment provides for a personal right to possess firearms. *Bruen*, 2022 WL 2251305, at *6; *cf. McDonald v. Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008). The *Bruen* Court explained, however, that this right did not just extend to possession of firearms at one's home, but also extended to the possession of firearms in public for self-defense. *Bruen*, 2022 WL 2251305, at *15. The *Bruen* Court also rejected the two-part test used by the Courts of Appeals for determining when an individual's Second Amendment right had been violated.[1] *Id.* at *10–11. Instead, the Court adopted a one-part test rooted in the text and history of the Second Amendment for conduct that falls within the plain text of the Second Amendment. *Id.* The one-part test requires the government to show the prohibition against possession of a firearm at issue has "a well-established and representative historical analogue." *Id.* at *13. While the historical analogue need not be a "historical twin" or a "dead ringer for historical precursors,"

---

[1] Doing so, the Supreme Court abrogated the Eighth Circuit's holding, in *United States v. Joos*, 638 F.3d 581 (8th Cir. 2011), that "it is well settled that Congress did not violate the Second Amendment" by promulgating § 922(g)(1).

2

it must be "analogous enough to pass constitutional muster." *Id.* "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* (quoting *Heller*, 554 U.S. at 599).

Accordingly, the new, limited test adopted in *Bruen* requires this Court to consider, and the government to show, whether there was a historical analogue that is "analogous enough" to the felon in possession statute at issue, 18 U.S.C. § 922(g)(1), such that it passes "constitutional muster." Here, Mr. Lindsey asserts both a facial challenge to § 922(g)(1) and an as-applied challenge.

1. ***Section 922(g)(1) is facially unconstitutional.***

First, on its face, the prohibition against felons possessing firearms has no historical analogue. Mr. Lindsey acknowledges that the Supreme Court explained in dicta in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." 554 U.S. at 626. And that Justice Kavanaugh's concurrence in *Bruen*, joined by Chief Justice Roberts, echoed that dicta. *Bruen*, 2022 WL 2251305 at *39 (Kavanaugh, J., concurring) (noting "the Second Amendment allows a 'variety' of gun regulations"). But as the dissent in *Bruen* noted, the New York statute struck down in *Bruen* had "a longer historical pedigree than" the "presumptively lawful" ban on possession of firearms by felons. *Bruen*, 2022 WL 2251305 at *61 (Breyer, J., dissenting). Indeed, "[f]ounding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) (noting "[t]he only evidence coming remotely close [to bans on possession of firearms based on criminality] lies in proposals made in the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions,"

3

and those proposals related to dispossessing those who were "in actual rebellion" or not "peaceful citizens" or potentially "of real danger of public injury"; concluding "[t]he concern common to all three is not about felons in particular or even criminals in general; it is about threatened violence and the risk of public injury"). At the time of this country's founding, prohibitions against possession of firearms were "adapted to the fears and threats of that time and place." *Id.* at 457 (collecting historical analyses and law review articles). The "fears and threats" at the time the Constitution was adopted were, as one familiar with American history must acknowledge, notably targeted toward enslaved persons.[2] In addition to enslaved persons, some

---

[2] A survey of the statutory prohibitions against possession or transfer of firearms shows this. The pre-revolution and post-revolution statutes cited in this brief can be found in the online repository created by the Duke Center for Firearms Law, available at: https://firearmslaw.duke.edu/repository/search-the-repository/. The statutory prohibitions against possession of firearms by enslaved person was one common prohibition among the states. *See e.g.*, 1731-43 S.C. Acts 168, § 23 ("It shall not be lawful for any slave, unless in the presence of some white person, to carry or make use of firearms or any offensive weapon whatsoever, unless such negro or slave shall have a ticket or license in writing from his master, mistress or overseer, to hunt and kill game, cattle, or mischievous birds or beasts of prey, and that such license be renewed once every month, or unless there be some white person of the age of 16 or upwards, in the company of such slave when he is hunting or shooting; or that such slave be actually carrying his masters arms to or from his masters plantation, by a special ticket, for that purpose, or unless such slave be found in the day time actually keeping off rice birds, or other birds within the plantation to which such slave belongs, lodging the same gun at night within the dwelling house of his master, mistress or white overseer. And provided also that no negro or other slave shall have liberty to carry any guns, cutlass, pistol or other weapon abroad form at any time between Saturday evening after sunset and Monday morning before sunrise notwithstanding a license or ticket for so doing."); A Digest of the Laws of the State of Georgia. From Its First Establishment as a British Province down to the Year 1798, Inclusive, and the Principal Acts of 1799: In Which is Comprehended the Declaration of Independence; the State Constitutions of 1777 and 1789, with the Alterations and Amendments in 1794. Also the Constitution of 1798 Page 153-154, Image 160-161 (1800) available at The Making of Modern Law: Primary Sources ("Laws of Georgia, An Act to amend and Continue "An Act for the Establishing and Regulating Patrols, and for Preventing any Person from Purchasing Provisions or any Other Commodities from, or Selling Such to any Slave, Unless Such Slave Shall Produce a Ticket from His or Her Owner, Manager or Employer . . . Be it enacted, That immediately from and after passing of this act, it shall not be lawful for any slave, unless in the presence of some white person, to carry or make use of fire arms, or any offensive weapon whatsoever, unless such

states also included prohibitions against possession of firearm by "free" Black people.[3] Native Americans were likewise targeted by firearms prohibitions.[4] Even Catholics were disarmed in

---

slave shall have a ticket or license in writing from his master, mistress, or overseer, to hunt and kill game, cattle, or mischievous birds or beasts of prey, and that such license be renewed every week, or unless there be some white person of the age of sixteen years or upwards in the company of such slave when he is hunting or shooting, or that such slave be actually carrying his master's arms to or from his master's plantation by a special ticket for that purpose, or unless such slave be found in the day-time, actually keeping off birds within the plantation to which such slave belongs, loading the same gun at night, within the plantation to which such slave belongs, loading the same gun at night, within the dwelling house of his master, mistress or white overseer: Provided always, That no slave shall have liberty to carry any gun, cutlass, pistol, or other offensive weapon, abroad at any time between Saturday evening after sunset and Monday morning before sun rise, notwithstanding a license or ticket for so doing."); An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792), § 8 ("No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense. § 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.").

[3] *E.g.*, 1806 Md. Laws § 44 (it shall not be lawful for any free negro or mulatto to go at large with any gun, or other offensive weapon); Oliver H. Strattan, City Clerk A Collection of the State and Municipal Laws, in Force, and Applicable to the City of Louisville, Ky. Prepared and Digested, under an Order from the General Council of Said City by Oliver H. Strattan and John M. Vaughan, City Clerks, which Includes the State Constitution and City Charter, with Notes of Reference Page 175, Image 176 (1857) available at The Making of Modern Law: Primary Sources ("No. 68. An Ordinance as to Retailing Gun Powder. No person shall retail gunpowder to minors under fifteen years of age, or free colored persons, without authority from his parent or guardian, or to slaves without authority from his master. Any person doing so in either case, shall be fined twenty dollars.").

[4] *E.g.*, Laws of the Colony of Massachusetts 1633, 37, § 2 ("And it is ordered, that no person whatsoever, . . . Nor shall any person sell, give or barter, directly or indirectly, any gun or guns, powder, bullets, shot, lead, to any Indian whatsoever, or to any person inhabiting out of this jurisdiction: Nor shall any amend or repair any gun belonging to any Indian, nor shall sell any

some places on the basis of allegiance. *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) (citing Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007) (citing Virginia's 1756 "disarmament of all those refusing the test of allegiance")).  Broadly speaking, those deemed disloyal to the colonies were also barred from possessing firearms.[5]  "In

---

armor or weapons, upon penalty of ten pounds for every gun, armor or weapons so sold, given or bartered, five pounds for every pound of powder, forty shillings for every pound of shot or lead, and proportionately for any greater or lesser quantity."); 1763 Pa. Laws 319, An Act to Prohibit the Selling of Guns, Gunpowder or Other Warlike Stores to the Indians, § 1 ("If any person or persons whatsoever shall directly or indirectly give to, sell barter or exchange with any Indian or Indians whatsoever any guns, gunpowder, shot, bullets, lead or other warlike stores without license . . . every such person or persons so offending, being thereof legally convicted . . . shall forfeit and pay the sum of five hundred pounds . . . and shall be whipped with thirty-nine lashes on his bare back, well laid on, and be committed to the common goal (jail) of the county, there to remain twelve months without bail or mainprise."); A Collection Of Original Papers Relative To The History Of The Colony Of Massachusetts-Bay Page 492, Image 497 (1769) available at The Making of Modern Law: Primary Sources ("Laws of the Colony of Massachusetts, That notwithstanding the ancient law of the country, made in the year 1633, that no person should sell any arms or ammunition to any Indian upon penalty of 10l. for every gun, 5l. for a pound of powder, and 40s. for a pound of shot. . . ."); 1844 Mo. Laws 577, An Act To Restrain Intercourse With Indians, ch. 80, § 4 ("No person shall sell, exchange or give, to any Indian, any horse, mule, gun, blanket, or any other article or commodity whatever, unless such Indian shall be traveling through the state, and leave a written permit from the proper agent, or under the direction of such agent in proper person.").

[5] *E.g.*, Act of Mar. 14, 1776, ch. VII, 1775-1776 Mass. Act at 31–32, 35 ("Chap. VII An Act for the executing in the Colony of the Massachusetts Bay, in New England, one Resolve of the American Congress, dated March 14, 1776, recommending the disarming of such persons as are notoriously disaffected to the cause of America, or who refuse to associate to defend by arms the United American Colonies, against the hostile attempts of the British fleets and armies, and for the restraining and punishing persons who are inimical to the rights and liberties of the said United Colonies, and for directing the Proceedings therein. Whereas on the fourteenth of March One Thousand Seven Hundred and Seventy-five, a certain resolve was made and passed by the American Congress, of the following tenor, viz. "Resolved, That it be recommended to the several Assemblies, Conventions and Councils, or Committees of Safety of the United Colonies, immediately to cause all persons to be disarmed within their respective Colonies, who are notoriously disaffected to the cause of America, or who have not associated and refuse to associate to defend by arms these United Colonies, against the hostile attempts of the British Fleets and Armies . . . ."); 1776 Pa. Laws 11, An Ordinance Respecting The Arms Of Non-Associators, § 1 ("The colonel or next officer in command of every battalion of militia in this

sum, founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety," but historical analysis does not support "a legislative power to categorically disarm felons because of their status as felons." *Kanter*, 919 F. 3d at 458 (Barrett, J., dissenting).

No doubt, there is historical precedent among the various states for prohibiting possession, or sale or transfer, of firearms to individuals that were deemed, at the time, threats to public safety or "dangerous."  But at the time of the founding of the country, no states barred felons from possessing firearms as "unvirtuous citizens," although felons were barred from engaging in other civic activities. *Kanter*, 919 F.3d at 645 (Barrett, J., dissenting) (citing Alexander Keyssar, *The Right to Vote*, 62–63 & tbl. A.7) ("If the right to bear arms was similarly subject to a virtue exclusion, we would expect to see provisions expressly depriving felons of that right too—but we don't."). Of the states that enacted right-to-arms provisions in their constitutions, none excepted criminals from those rights, while some of the same constitutions did expressly exclude criminals from the right to vote. *Id.*

The issue, as stated in *Bruen*, is whether the categorical ban on possession of firearms by felons is "consistent with this Nation's historical tradition of firearm regulation." 2022 WL 2251305, at *15.  The government bears the burden of showing the historical analogue. *Id.* Faithfully applying that test, such an analogue does not exist.  Consequently, the Court should

---

state is hereby authorized, empowered and required to collect, receive and take all the arms in his district or township nearest to such officer which are in the hands of non-associators in the most expeditious and effectual manner in his power, and shall give to the owners receipts for such arms, . . ."); 1777 Pa. Laws 61 An Act, obliging the male white inhabitants of this state to give assurances of allegiance to the same, and for other purposes therein mentioned, ch. XXI, §§ 2, 4 ("Sect. 4. And be it further enacted by the authority aforesaid, That every person above the age aforesaid refusing or neglecting to take and subscribe the said oath or affirmation, shall during the time of such neglect or refusal, . . . shall be disarmed by the lieutenant or sublieutenants of the city or countries respectively.").

find § 922(g)(1) facially unconstitutional and dismiss Count 3 of the indictment against Mr. Lindsey.

   2. *Section 922(g)(1) is unconstitutional as applied here.*

The *Bruen* opinion appears to have abrogated Eighth Circuit law on as-applied challenges to § 922(g)(1). In particular, the *Bruen* opinion places the burden on the government to show a "historical analogue" but the opinion does not address an as-applied challenge. The shift in the test and burden suggests that the government has the burden to show that, as applied to Mr. Lindsey, a historical analogue exists for the prohibition against possession of firearms for him. But even if that burden were different, and placed on Mr. Lindsey, Mr. Lindsey can still show § 922(g)(1) violates his Second Amendment right because there is no "historical analogue" to firearms prohibitions against individuals like him. *Cf. United States v. Adams*, 914 F.3d 602, 605 (8th Cir. 2019) ("At a minimum, to succeed on an as-applied challenge, [the defendant] must establish (1) that the Second Amendment protects his particular conduct, and (2) that his prior felony conviction is insufficient to justify the challenged regulation of Second Amendment rights.").[6]

As a preliminary matter, *Bruen* indicates that the Second Amendment's text protects the right to possession of firearms in public for self-defense. *Bruen*, 2022 WL 2251305, at *15. Second, as explained above, there is no historically analogous prohibition against possession of firearms by felons, and more specifically no historically analogous prohibition against possession of firearms for people with felonies similar to Mr. Lindsey's adult felonies.[7] In this case, Mr.

---

[6] *Bruen* abrogated the second part of the *Adams* test, replacing the means-ends analysis with an inquiry into whether there is an "historical analogue."

[7] While the Third Circuit recently decided *Range v. Attorney General United States*, 53 F.4th 262 (3d Cir. 2022), it is inconsistent with the notion of *Bruen* and should be disregarded.

Lindsey is a felon. His criminal history, prior to September 30, 2021, includes adult felony convictions for forgery in Iowa (Story Co. Case No. FECR54811 and Marshall Co. Case No. FECR90390). These felonies do not suggest that Mr. Lindsey would have been grouped with those deemed "dangerous" at the time of the adoption of the Second Amendment. Therefore, Mr. Lindsey is "no more dangerous than a typical law-abiding citizen" and he should not be prohibited from possessing a firearm in his own home. *United States v. Brown*, 436 F.App'x 725, 726 (8th Cir. 2011) (citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should dismiss Count 3 of the Indictment, along with the related notice of forfeiture, because the charge under 18 U.S.C. § 922(g)(1) infringes on Mr. Lindsey's Second Amendment right.

Respectfully Submitted,

 /s/ Melanie S. Keiper
Melanie S. Keiper, Asst. Federal Defender
FEDERAL PUBLIC DEFENDER'S OFFICE
400 Locust Street, Suite 340
Des Moines, Iowa 50309-2353
PHONE: (515) 309-9610
FAX: (515) 309-9625
E-MAIL: melanie_keiper@fd.org
ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2023, I electronically filed this document with the Clerk of Court using the ECF system, which will serve it on the appropriate parties.

 /s/ Melanie S. Keiper